MILLARD F. McKEEL, PLAINTIFF v. ROBERT B. ARMSTRONG, DAVID J. CONROY, HARVEY L. HAYNES, GEORGE M. BILBREY, JR., H. D. CREWS, ARTHUR S. MORRIS, JR., JOHN O. McGUIRE, JOHN A. McLEOD, JR., P. RICHARD OLSON, ISADORE M. PIKE, LARY A. SCHULHOF, THOMAS F. KENNEDY, ARTUS M. MOSER, JR., ROBERT F. BURGIN, E. STANLEY WILLETT AND MEMORIAL MISSION HOSPITAL, DEFENDANTS

No. 8928SC234

(Filed 5 December 1989)

**Physicians, Surgeons, and Allied Professions § 7 (NCI3d) — deprivation of neurosurgeon's privilege to practice at hospital — no malicious or fraudulent intent by defendants**

In an action for actual and punitive damages for the deprivation of plaintiff neurosurgeon's privileges to practice his profession at defendant hospital, the trial court properly entered summary judgment for defendants where there was no evidence

of any kind that defendants, who were staff members of the hospital and either held administrative positions at the hospital or were members of the various committees involved in the investigation, discipline, and appeals process of this case, at any time and in any way acted with malicious and fraudulent intent toward plaintiff. N.C.G.S. § 131E-95.

**Am Jur 2d, Hospitals and Asylums §§ 8-11.**

APPEAL by plaintiff from Order entered 3 October 1988 by *Judge Robert D. Lewis* in BUNCOMBE County Superior Court. Heard in the Court of Appeals 20 September 1989.

This action for actual and punitive damages for the deprivation of the plaintiff neurosurgeon's privileges to practice his profession at the defendant hospital was instituted on 13 August 1987 in Superior Court, Buncombe County. After Answer and considerable discovery, defendants filed a Motion for Summary Judgment, which was allowed. From that Order, the plaintiff appealed.

The record before us contains the following allegations of fact:

In May of 1982, the director of nursing at Memorial Mission Hospital (MMH) referred two cases of the plaintiff's, Dr. McKeel, to the Medical Care Evaluation Committee (MCEC), an internal hospital committee with the responsibility to review and evaluate the quality of care given to patients at the facility. The two cases were brought to the attention of MCEC because of concerns over the care rendered those patients by Dr. McKeel. Dr. McKeel, who at the time had treated patients at MMH for over twenty-seven years, was reprimanded for his conduct in one of those cases because he did not respond appropriately to nursing calls made to him. Several months later two more of Dr. McKeel's cases were referred to the MCEC by the nursing department, again out of concerns about the neurosurgical care he provided. With four charts referred to it in the space of several months, the chairman of the MCEC, Dr. Bilbrey, decided to appoint an ad hoc committee of Drs. Schulhof, McLeod and Olson to review neurosurgical care of head trauma patients at MMH.

In a letter dated 10 September 1982, Dr. Bilbrey instructed the ad hoc committee to determine the local standard of care concerning head trauma patients and then evaluate whether the quality of care provided in the four McKeel cases was "consistent" with

McKEEL v. ARMSTRONG

[96 N.C. App. 401 (1989)]

that standard of care. This head trauma study began with an examination of twenty charts, but was increased by the committee to eighty-six cases to help ensure a fair and impartial evaluation process.

The same concern for fairness prompted the committee to use the "algorithm method" for reviewing the charts of hospital head trauma patients in order to determine the standard of care in the community. Under this evaluation method, parameters were established describing what steps should be taken in the treatment of a patient depending on the patient's condition. After the treatment parameters or criteria were developed, hospital personnel not on the study committee compared the actual treatment procedures followed by the doctors as recorded in the eighty-six charts against the criteria standards. Actual treatment procedures that varied from the criteria treatment norms were flagged by the investigators and those charts were set aside for further review by the study committee members to determine the reasons for the treatment deviations.

In developing the criteria for review of the hospital charts, the ad hoc committee members relied on their experience in quality assurance review, in prior peer review activity, and in their areas of specialty. They consulted other hospitals, referred to medical texts in neurosurgery and other fields, and utilized hospital quality assurance personnel. No charts of any physician were reviewed until the standards for review had been established and the algorithm developed.

On 21 June 1983 the results of this first study were reported to the MCEC. That committee considered the results and framed four recommendations to the Medical Administrative Committee (MAC). The MAC provided the plaintiff, and another doctor, whose treatment procedures also had come under scrutiny during the study and who also happened to be the plaintiff's partner, with a copy of the first study and with an opportunity to appear before the MAC to respond to the study results. Dr. McKeel responded and raised a number of questions concerning the study, most notably that one case he did not treat had been incorrectly assigned to him by the investigators, and that the four original cases in question occurred in 1982 while the rest of the investigation sample was drawn only from 1981 cases. In response to his objections the MAC did three things: it affirmed the criteria used in the study;

it deleted some statistical material concerning death-rate comparisons; and it expanded the study to include all serious head trauma cases at the hospital for the calendar year 1981. This last step sent the number of cases in the investigation pool up from eighty-six to 178.

The ad hoc study committee then conducted a supplemental investigation and reported to the MCEC in November 1983. The MCEC considered the report and, based upon the ad hoc committee's investigation of the 1981 cases and their review of the four original 1982 cases involving Dr. McKeel, made several recommendations for disciplinary action to the MAC concerning Dr. McKeel, including that:

1. his privileges for the care of head injury patients be withdrawn for six months;

2. at the end of six months, Dr. McKeel could reapply for privileges to care for patients at the hospital. However, as part of that application, the plaintiff must take twenty-five hours of instruction in the care of head injury patients; and

3. any case of inappropriate care concerning a head injury patient rendered by Dr. McKeel that occurred within two years of the disciplinary action would be subject to immediate review by the chief of staff, who was encouraged to terminate all privileges of the plaintiff to practice at MMH if the chief felt the treatment discrepancy was significant.

The MAC voted to accept the recommendations for disciplinary action made by the MCEC, and pursuant to that action the plaintiff's privileges concerning the treatment of head trauma patients at MMH were curtailed. Plaintiff appealed the decision to an Ad Hoc Hearing Committee, which affirmed the MAC's decision. Pursuant to the hospital's by-laws, plaintiff appealed to an Ad Hoc Appeal Committee, which unanimously affirmed the curtailment of privileges. This litigation followed.

*Morris, Bell & Morris, by William C. Morris, Jr., for plaintiff appellant.*

*Roberts, Stevens & Cogburn, by Isaac N. Northup, Jr., for defendants Bilbrey, Moser, Crews, Morris, Schulhof and Willett; and Van Winkle, Buck, Wall, Starnes & Davis, by Russell P. Brannon and Michelle P. Rippon, for defendants Armstrong, Conroy, Haynes, McGuire, Olson, Pike, Kennedy, McLeod, Burgin and Memorial Mission Hospital.*

McKEEL v. ARMSTRONG

[96 N.C. App. 401 (1989)]

ARNOLD, Judge.

The defendants in this case were at the period of time in question staff members of MMH and either held administrative positions at the hospital or were members of the various committees involved in the investigation, discipline, and appeals process of this case. Defendant MMH is a non-profit, private hospital with a governing board that carries the ultimate responsibility for the proper quality of patient care at the facility. This responsibility is in part delegated to the medical staff. The medical staff, of which Dr. McKeel is a member, has adopted by-laws, rules and regulations, and upon being granted the privilege to treat patients at the hospital, each staff member is required to abide by these. The Medical Staff By-Laws provide for certain peer review in evaluating the quality of care given to hospital patients. Specifically, the MCEC has the responsibility to "review and evaluate the quality of care given to patients." Art. VII, Sect. 2, Para. 2(J). Staff By-Laws, MMH; *see also* Art. III, Sect. 7, Sup. A, Para. 1., Staff By-Laws, MMH.

In his deposition testimony, Dr. McKeel recognized that MMH has the duty to its patients to determine if the physicians on the staff followed the standard of care in the medical community. He admitted the peer review system at the hospital was, in part, designed for that purpose, and that it was appropriate, when fairly executed, for peer review to be used in instances where there was some indication a physician's practice was below the standards of practice.

Plaintiff, however, contends the peer review conducted by MMH in regard to his treatment of patients in 1981 and 1982 was designed solely to deprive him of his hospital privileges. Plaintiff relies on N.C.G.S. § 131E-95 to propel his lawsuit. That statute provides in pertinent part:

Medical review committee.

(a) A member of a duly appointed medical review committee who acts without malice or fraud shall not be subject to liability for damages in any civil action on account of any act, statement or proceeding undertaken, made, or performed within the scope of the functions of the committee.

Plaintiff here alleges that members of the various committees involved in this internal investigation at MMH acted with malicious and fraudulent intent towards him. We disagree.

Malice is defined as:

The intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. A condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another, or to do intentionally a wrongful act toward another without justification or excuse.

Black's Law Dictionary 862 (Rev. 5th Ed. 1979). The North Carolina Supreme Court states "malice in law" is "presumed from tortious acts, deliberately done without just cause, excuse, or justification, which are reasonably calculated to injure another or others." *Betts v. Jones*, 208 N.C. 410, 411, 181 S.E. 334, 335 (1935).

The essential elements of fraud were enumerated in *Cofield v. Griffin*, 238 N.C. 377, 379, 78 S.E.2d 131, 133 (1953):

(1) That defendant made a representation relating to some material past or existing fact; (2) that the representation was false; (3) that when he made it, defendant knew that the representation was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that plaintiff reasonably relied upon the representation, and acted upon it; and (5) that plaintiff thereby suffered injury.

This case comes before us on an appeal of summary judgment granted on behalf of defendants. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." N.C.G.S. § 1A-1, Rule 56(c). The burden, of course, is on the moving party to establish the lack of a triable issue of fact. *Seay v. Allstate Ins. Co.*, 59 N.C. App. 220, 296 S.E.2d 30 (1982). In order to bear its burden, a defendant is required to present a forecast of the evidence which is available at trial and which shows that there is no material issue of fact concerning an essential element of the plaintiff's claim and that such element could not be proved by the plaintiff through the presentation of substantial evidence. *Jenkins v. Stewart & Everett Theaters, Inc.*, 41 N.C. App. 262,

McKEEL v. ARMSTRONG

[96 N.C. App. 401 (1989)]

254 S.E.2d 776, *disc. rev. denied*, 297 N.C. 698, 259 S.E.2d 295 (1979). An adequately supported motion for summary judgment triggers the opposing party's responsibility to come forward with facts, as distinguished from allegations, sufficient to indicate that he will be able to sustain his claim at trial. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). We hold defendants' presentation of the evidence demonstrates that no material issue of fact exists here, and we fail to see any facts presented by plaintiff to indicate he could sustain his claim if we allow it to proceed.

Plaintiff's main allegation is that the committee appointed by Dr. Bilbrey ignored its responsibilities as outlined in a letter from Dr. Bilbrey dated 10 September 1982. Instead of following Dr. Bilbrey's direction, Dr. McKeel contends the ad hoc study committee maliciously sought to deprive him of his right to practice his profession. This allegation has no merit. Dr. Bilbrey's letter states that the ad hoc committee had two goals: to examine the general standard of treatment of head trauma patients at MMH, and "to review the four charts listed above." The "four charts" mentioned in the letter are the charts referred to the MCEC by the nursing department concerning Dr. McKeel's treatment practices. Thus, the ad hoc committee had a specific charge to look at the four original cases that initially prompted Dr. Bilbrey to launch the investigation. Any appearance that the ad hoc committee focused more closely on Dr. McKeel's treatment of patients than on any other doctor's was not inappropriate because such an emphasis was within the charge of the committee.

Likewise, we fail to see any fraud or malice concerning the development or use of the algorithmic study the ad hoc committee used to determine if a hospital-wide problem existed in the treatment of head trauma patients. The record unequivocally reveals that the committee took a number of steps to ensure objectivity and fairness in their review process. This investigation took over two years to conduct and produced voluminous amounts of data. The final study, which formed only part of the basis for the disciplinary action against Dr. McKeel, examined every case involving a major head trauma injury treated at MMH in 1981. Every physician who treated head trauma injuries at the hospital that year was included in the investigation.

The first stage and major portion of the investigation was structured so the investigators who reviewed the 1981 cases did

McKEEL v. ARMSTRONG

[96 N.C. App. 401 (1989)]

not know which doctor had attended the case under examination. While the second stage of the review process involved arguably more subjective evaluations and the attending physician in each case was known to the investigator, a close examination of the record fails to disclose any evidence of fraud or malice on the part of the reviewers. After the committee conducted its initial study, plaintiff was allowed to respond to the results. In response to plaintiff's criticisms, the committee changed several aspects of the study and conducted a supplemental investigation.

Plaintiff argues that malice is implied because the ad hoc committee was chaired by Dr. McKeel's competitor in the community, Dr. Schulhof. The record, however, is devoid of any facts indicating Dr. Schulhof's appointment to the committee or his actions on the committee amounted to malice or were carried out in a fraudulent manner.

Plaintiff argues malice is implied because the study committee did not seek outside consultation during its investigation. Again we fail to see any facts to support this argument. Dr. Bilbrey's letter clearly indicated the committee *could* seek outside consultation if it chose to. The committee's choice to perform an in-house investigation is not evidence of fraud or malice.

Plaintiff also argues the investigation was fraudulent because Dr. Schulhof's cases, which were examined as part of the study of the 1981 head trauma case, were not reviewed separately. Dr. Bilbrey's letter to the ad hoc committee stated any chart of an ad hoc committee member that was investigated should be handled by the MCEC instead of by that ad hoc committee member. Plaintiff argues because Dr. Schulhof's charts were not reviewed by the MCEC, the investigation was fraudulent. We disagree. As was stated earlier, the first stage of the investigation was conducted so that it was impossible to know which doctor was involved in the case being investigated. At the second stage, Dr. Schulhof's cases were examined by the other two members of the ad hoc committee.

All the allegations raised by plaintiff point to areas of the internal investigation process where possible conflicts of interest could arise. As in almost any situation of this nature, opportunities existed here to compromise the investigation if the persons involved had been motivated by malicious intent. In this case, however, plaintiff has failed to produce any evidence of such intent.

McKEEL v. ARMSTRONG

[96 N.C. App. 401 (1989)]

Plaintiff's own statements reinforce our belief that no material facts are in dispute in this case. Plaintiff admitted that he had no evidence that defendants acted fraudulently or with malice. For example, the following exchange is from plaintiff's deposition testimony:

> MR. NORTHUP [defendants' attorney]: Do you have any evidence that Drs. Bilbrey, Crews, Morris, Schulhof, Moser or Willett acted fraudulently in the supplemental study or in the review of the four 1982 charts or in their participation in the actions which led to the curtailment of your privileges?

> DR. McKEEL: I don't think I have any hard evidence that I could present.

Plaintiff further stated that his evidence of malice would be "impossible to produce," and that the evidence consisted of "[r]emarks by individuals." Plaintiff would not list as witnesses the persons who made these remarks nor reveal their names because "it would put the individual in an awkward position and probably not do me any good." As to the substance of the testimony from these witnesses, the following exchange occurred:

> MR. NORTHUP: Do you have any evidence from any of those witnesses that we reviewed earlier that my clients acted deliberately to interfere with an expressed or implied contract which you say you had with the hospital?

> DR. McKEEL: No.

Plaintiff's failure to produce any evidence demonstrating fraudulent conduct or malicious behavior requires us to affirm the trial court order.

Affirmed.

Chief Judge HEDRICK and Judge BECTON concur.