WOLFGANG E. LOHRMANN, M.D., PLAINTIFF-APPELLANT v. IREDELL MEMORIAL HOSPITAL INCORPORATED D/B/A IREDELL MEMORIAL HOSPITAL'S HEALTH CARE SYSTEM, DEFENDANT-APPELLEE

No. COA04-1373

(Filed 18 October 2005)

**1. Hospitals and Other Medical Facilities— bylaws—contract with doctor**

There was no issue of fact as to whether defendant-hospital's bylaws constituted a contract with a doctor whose staff privileges were suspended.

## 2. Hospitals and Other Medical Facilities— suspension of medical privileges—bylaws not breached

There was no genuine issue of material fact on the question of whether defendant-hospital breached its bylaws in suspending plaintiff's medical privileges, and summary judgment was properly granted for defendant. Although plaintiff contended that handwritten notes from nurses did not properly request corrective action under the bylaws, the person requesting the correction was the CEO, who addressed the Executive Committee with the notes from the nurses in hand. These complaints referred to the specific activities which constituted the grounds for the request. The CEO's request, though not in writing, was supported by the written complaints of nurses that referred to specific activities or conduct.

## 3. Hospitals and Other Medical Facilities— suspension of medical privileges—bylaws not breached—applicable to formal hearing

A hospital complied with its bylaws in suspending a doctor's staff privileges where the doctor contended that he had not been given copies of nurses's complaints and notice of an executive committee meeting at which those complaints were considered. The bylaw provision cited by the doctor does not apply to the process of investigating physician conduct, but to the formal hearing and appellate review subsequent to an adverse Executive Committee recommendation. Moreover, as to the hearing, none of the investigatory steps provided by the bylaws were omitted.

## 4. Physicians and Surgeons— suspension of staff privileges— notice of charges

A doctor whose staff privileges were suspended by a hospital had sufficient notice of the charges against him to be able to present facts and defend his conduct at a hearing before a panel of medical staff members. Although he argued that he had not received notice that his conduct was "disruptive," the issues regarding his care of patients were the same throughout the proceedings, whatever the label.

## 5. Civil Procedure— findings made during preliminary injunction—not binding at trial

The findings of fact made during a preliminary injunction proceeding are not binding at a trial on the merits, and the trial court

here did not err by determining that there was no genuine issue of material fact and awarding summary judgment for defendant.

## 6. Hospitals and Other Medical Facilities— suspension of medical privileges—grounds

N.C.G.S. § 131E-85 provides that a hospital may take into account the judgment and character of a physician, as well as the reasonable objectives and regulations of the hospital, in suspending a physician's privileges. In this case although plaintiff contended that his privileges were suspended solely for violating patients' rights concerning living wills and control of decisions, other factors were clearly at issue throughout the corrective proceedings.

## 7. Hospitals and Other Medical Facilities— suspension of doctor's privileges—not unreasonable or unfair

A hospital's decision to suspend a doctor's staff privileges was not arbitrary and capricious or based on irrelevant considerations, and was based upon the reasonable objectives and regulations of the hospital.

Appeal by plaintiff from judgment entered 22 June 2004 by Judge Mark E. Klass in Superior Court, Iredell County. Heard in the Court of Appeals 16 August 2005.

*Smith Moore LLP, by Samuel O. Southern and Harriett Twiggs Smalls; and Eisele, Ashburn, Greene & Chapman, P.A., by Douglas G. Eisele for plaintiff-appellant.*

*Womble Carlyle Sandridge & Rice, PLLC, by Anthony H. Brett and Donald R. Esposito, for defendant-appellee.*

McGEE, Judge.

Wolfgang Lohrmann, M.D. (Dr. Lohrmann) filed suit against Iredell Memorial Hospital, Incorporated (Memorial Hospital) when Memorial Hospital's governing body suspended Dr. Lohrmann's medical staff privileges in early 2003. Dr. Lohrmann alleged breach of contract, failure to comply with N.C. Gen. Stat. § 131E-85, and violation of his rights to substantive and procedural due process of law.

Dr. Lohrmann was a medical doctor practicing in Iredell County in the speciality of nephrology, dealing with diseases of the kidney. Memorial Hospital was a nonprofit organization located in Statesville,

North Carolina, licensed to conduct business as a hospital for the general public. Dr. Lohrmann was a member of the medical staff at Memorial Hospital and exercised medical staff privileges in nephrology. Memorial Hospital's corporate bylaws and medical staff bylaws permitted Memorial Hospital to take corrective action against members of its medical staff. The bylaws stated that corrective action could include suspension of medical staff privileges.

In February and March 2002, Dr. Lohrmann provided care and treatment to Ms. S and Mr. W, two Memorial Hospital patients. Ms. S was an eighty-year-old patient admitted to Memorial Hospital on 14 February 2002, with a diagnosis of gangrene of the left foot. Mr. W was a seventy-five-year-old patient who was admitted through Memorial Hospital's emergency room on 16 March 2002, with shortness of breath and low blood pressure. Both patients later died while being treated at Memorial Hospital.

At a meeting of Memorial Hospital's Medical Executive Committee (Executive Committee) on 22 April 2002, Arnold Nunnery, Chief Executive Officer (CEO) of Memorial Hospital, presented handwritten complaints by Nurse Traci Jenkins and Nurse Gail Roberts regarding Dr. Lohrmann's care of Ms. S and Mr. W. Nurse Jenkins, who was also the granddaughter of Ms. S, reported that Dr. Lohrmann made arrangements for a surgical consultation to amputate Ms. S's leg, despite Ms. S's living will and despite discussion with family members that Ms. S's leg should not be amputated. Nurse Jenkins also reported that Dr. Lohrmann was unwilling to speak with Ms. S and confirm Ms. S's consent to the amputation in the presence of Nurse Jenkins.

Nurse Roberts reported concerns about Dr. Lohrmann's changes to Mr. W's code status, the set of instructions for medical personnel should Mr. W. experience cardiac arrest or respiratory failure. Nurse Roberts reported that Dr. Lohrmann changed Mr. W's code status twice without discussing the changes with Mr. W's primary physician and that Dr. Lohrmann's instructions were too confusing for the nurses to follow.

After reviewing the written complaints of Nurse Jenkins and Nurse Roberts, the Executive Committee authorized a review of both cases by an outside physician. The two cases were reviewed by Dr. Ronald Falk (Dr. Falk), Chief of the Division of Nephrology & Hypertension at the UNC School of Medicine. Dr. Falk submitted his report to the CEO of Memorial Hospital in a letter dated 5 July 2002. The Executive Committee reviewed Dr. Falk's report on 26 August

LOHRMANN v. IREDELL MEM'L HOSP., INC.

[174 N.C. App. 63 (2005)]

2002 and, in accordance with the medical staff bylaws, decided that the Chair of the Department of Medicine at Memorial Hospital would discuss voluntary suspension with Dr. Lohrmann. Dr. Lohrmann refused the Chair's suggested thirty-one-day suspension. Thereafter, in accordance with the medical staff bylaws, a departmental ad hoc investigating committee (the investigating committee) was appointed to consider the accusations against Dr. Lohrmann. Memorial Hospital's CEO informed Dr. Lohrmann of the appointment of the investigating committee in a letter dated 28 August 2002.

The CEO and Byron E. Dunaway, M.D., president of the medical staff of Memorial Hospital, provided Dr. Lohrmann with a statement of the charges against Dr. Lohrmann in a letter dated 18 September 2002. The letter stated that the Executive Committee had reviewed Dr. Falk's report and had concluded that Dr. Lohrmann's performance in treating Ms. S and Mr. W was "lower than the standards of [Memorial Hospital's] Medical Staff[.]" The letter detailed the following specific conduct that the Executive Committee stated failed to meet medical staff standards: (1) violation of Ms. S's rights "by not honoring [her] wishes as discussed in her Living Will and as per her family's wishes"; and (2) violation of Mr. W's rights "in relation to whether or not he should be resuscitated as provided by physician's order . . . [which] was written on the basis of prior discussion with [Mr. W] and [his] family."

The investigating committee interviewed a number of individuals, including Dr. Lohrmann, between 20 and 23 September 2002. The written summary of the investigating committee indicated the issues concerning Dr. Lohrmann were patient rights, as well as "communication with the patient/family/nursing/consulting physician attending." The investigating committee made the following pertinent findings: (1) there was poor communication and handling of disagreements with family members; and (2) it was not clear from the record that Mr. W's code status had been discussed with the attending physician prior to the change made by Dr. Lohrmann.

The Executive Committee met on 23 September 2002 to review the investigating committee's summary. Pursuant to medical staff bylaws, Dr. Lohrmann and his attorney were present for the meeting of the Executive Committee and were permitted to make statements and answer questions. After the Executive Committee met with Dr. Lohrmann and considered the investigating committee's summary, the Executive Committee voted to suspend Dr. Lohrmann

for seven days and to require him to complete a patient-oriented medical ethics course.

Pursuant to Article VII, Section 2 of the medical staff bylaws, the CEO notified Dr. Lohrmann of the Executive Committee's recommendation in a letter dated 24 September 2002. The letter stated:

> The reason for the adverse recommendation by [the Executive Committee] is that your actions taken in managing the professional services for the patients [Ms. S and Mr. W] were below the acceptable standards for members of the Medical Staff. Your determination that [Ms. S] was capable of consenting for the amputation of a limb was inconsistent with her medical condition and her Living Will; also it required close coordination with involved family members and physicians, which did not effectively occur. Your alteration of the DNR status of [Mr. W] without first obtaining the concurrence of the primary physician was inappropriate, and you entered an inappropriate order to effect the change.

Pursuant to Article VI, Section 1(f) of the medical staff bylaws, the Executive Committee's recommendation for suspension entitled Dr. Lohrmann to exercise procedural rights to a hearing before a panel of medical staff members appointed by the president of the medical staff. Dr. Lohrmann made a timely request for a hearing before a panel (the panel) which was granted. At the panel's hearing on 13 and 14 January 2003, Dr. Lohrmann was present and represented by counsel who called, examined, and cross-examined witnesses. The panel prepared a written report dated 18 February 2003 in which it concluded that a corrective action by the Executive Committee was an appropriate response to Dr. Lohrmann's conduct, but recommended alternatives to suspension. In its report, the panel also noted that it "[took] exception to [the Executive Committee's] conclusion that patients' rights were violated. Nonetheless, principles of medical ethics [were] brought into question by Dr. L[ohrmann]'s conduct." The Executive Committee convened on 24 February 2003 to consider the findings of the panel. The Executive Committee reinstated the recommendation for a seven-day suspension and also imposed the alternatives to suspension recommended by the panel. The Executive Committee further decided that if Dr. Lohrmann failed to complete the alternatives, then he would be suspended for a total of thirty-one days.

Pursuant to the medical staff bylaws, Dr. Lohrmann appealed the Executive Committee's recommendation to the governing body

of Memorial Hospital. The governing body heard Dr. Lohrmann's appeal and affirmed the recommendation of the Executive Committee on 3 April 2003.

Dr. Lohrmann filed a verified complaint and motion for a temporary restraining order and preliminary injunction on 4 April 2003. Judge Christopher M. Collier (Judge Collier) granted Dr. Lohrmann's motion for a temporary restraining order (TRO) and prohibited Memorial Hospital from revoking, suspending, curtailing or placing any other restriction on Dr. Lohrmann's medical staff privileges until the hearing on the motion for preliminary injunction. The TRO also prohibited Memorial Hospital from reporting its corrective action to the North Carolina Medical Board (the Medical Board) until: (1) the entry of an order dismissing the TRO or denying a preliminary injunction; or (2) the determination of the case on its merits, whichever occurred first. By order dated 24 April 2003, Judge Larry G. Ford (Judge Ford) allowed Dr. Lohrmann's motion for preliminary injunction and enjoined Memorial Hospital from suspending Dr. Lohrmann's medical staff privileges and from reporting its action to the Medical Board. Dr. Lohrmann filed a verified first amended complaint on 25 April 2003. Dr. Lohrmann filed and served a motion for summary judgment on 18 March 2004 seeking to obtain permanent injunctive relief. Memorial Hospital filed and served its own motion for summary judgment on 20 May 2004.

Judge Mark E. Klass (Judge Klass) denied Dr. Lohrmann's motion for summary judgment and entered summary judgment in favor of Memorial Hospital on 21 June 2004. Judge Klass ordered that the preliminary injunction entered by Judge Ford be dissolved, but stayed dissolution until 1 July 2004 to allow Dr. Lohrmann time to appeal to this Court. We entered an order on 1 July 2004 staying Judge Klass's order pending our ruling on Dr. Lohrmann's petition for writ of supersedeas. This Court then granted Dr. Lohrmann's petition on 13 July 2004 and stayed Judge Klass's order pending the outcome of the appeal.

Dr. Lohrmann argues four grounds on which the trial court erred in granting summary judgment for Memorial Hospital: (I) Memorial Hospital's bylaws constituted a contract between Dr. Lohrmann and Memorial Hospital; (II) there were genuine issues of material fact as to whether Memorial Hospital breached its bylaws; (III) findings of fact in the preliminary injunction were supported by the record and gave rise to genuine issues of material fact; and (IV) Memorial

Hospital's efforts to suspend Dr. Lohrmann were in violation of N.C. Gen. Stat. § 131E-85.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2003). The burden is on the moving party to establish the lack of a triable issue of fact. *McKeel v. Armstrong*, 96 N.C. App. 401, 406, 386 S.E.2d 60, 63 (1989). To meet its burden, the movant is required to present a forecast of the evidence available at trial that shows there is no material issue of fact concerning an essential element of the non-movant's claim and that the element could not be proved by the non-movant through the presentation of further evidence. *Id.* Once the movant has supported its motion for summary judgment, the burden shifts to the other party "to introduce evidence in opposition to the motion setting forth 'specific facts showing that there is a genuine issue for trial.'" *Metal Works, Inc. v. Heritage, Inc.*, 43 N.C. App. 27, 31, 258 S.E.2d 77, 80 (1979). Appellate review of entry of summary judgment requires a two-part analysis of whether, "(1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law." *Charlotte Eastland Mall, LLC v. Sole Survivor, Inc.*, 166 N.C. App. 659, 661, 608 S.E.2d 70, 72 (2004) (citations and internal quotation marks omitted).

I.

[1] Dr. Lohrmann argues that the trial court erred in granting summary judgment to Memorial Hospital because Memorial Hospital's bylaws constituted a contract between Memorial Hospital and Dr. Lohrmann. Dr. Lohrmann cites our Court's decision in *Virmani v. Presbyterian Health Services Corp.*, 127 N.C. App. 71, 488 S.E.2d 284, *disc. review denied*, 347 N.C. 141, 492 S.E.2d 38-39 (1997), in which we held that if a hospital's offer to extend staff privileges to a physician includes a condition that the physician adhere to certain bylaws and the physician accepts the hospital's offer, then those bylaws become part of the contract between the hospital and the physician. *Virmani*, 127 N.C. App. at 76-77, 488 S.E.2d at 288. We adhere to the principle of law articulated in *Virmani* that a claim for breach of contract may arise from an employer's failure to adhere to its bylaws. We find no genuine issue of material fact as to whether Memorial

**LOHRMANN v. IREDELL MEM'L HOSP., INC.**

[174 N.C. App. 63 (2005)]

Hospital's bylaws constitute a contract between Memorial Hospital and Dr. Lohrmann, and Memorial Hospital does not dispute that such a contract exists.

## II.

**[2]** Dr. Lohrmann argues that the trial court erred in finding no genuine issue of material fact as to whether Memorial Hospital breached its bylaws in suspending Dr. Lohrmann's medical privileges. For the reasons discussed below, we disagree.

On the issue of breach, Dr. Lohrmann first argues that Memorial Hospital failed to comply with Article VI, Section 1(a) of its medical staff bylaws regarding commencement of corrective action:

> (a) ... [C]orrective action against [a] physician or dentist may be requested by any officer of the Medical Staff, by the Chief Executive Officer, or by the Governing Body. All requests for corrective action shall be in writing, shall be made to the Executive Committee and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request.

Specifically, Dr. Lohrmann argues that (1) corrective action was not requested by an officer of the medical staff, the CEO, or the governing body; (2) the request for corrective action was not in writing; (3) the request for corrective action was not directed to the Executive Committee; and (4) the request for corrective action was not supported by reference to the specific activities or conduct which constituted the grounds for the request.

Dr. Lohrmann argues that the handwritten notes of Nurse Jenkins and Nurse Roberts do not suffice as written requests for corrective action with the degree of specificity required by the medical staff bylaws. Morever, Dr. Lohrmann contends that neither Nurse Jenkins nor Nurse Roberts falls within the category of individuals who may request corrective action. However, it appears from the record that the CEO was the person who requested that corrective action be taken against Dr. Lohrmann. The CEO, with the written complaints from Nurse Jenkins and Nurse Roberts in hand, addressed the Executive Committee with his concerns on 22 April 2002. These written complaints referred to the specific activities or conduct which constituted the grounds for the request. Under these facts, Memorial Hospital substantially complied with its bylaw procedures for requesting corrective action when its CEO directed a request for cor-

rective action to the Executive Committee. The CEO's request, though not in writing, was supported by the written complaints of Nurse Jenkins and Nurse Roberts that referred to the specific activities or conduct which constituted the grounds for the request.

[3] Dr. Lohrmann next argues that Memorial Hospital failed to comply with its corporate bylaw provision that requires an affected medical staff practitioner to be heard at each step of the disciplinary process. The corporate bylaw Dr. Lohrmann cites is Article VII, Section 3, which provides: "The Medical Staff Bylaws shall include: (a) A mechanism for review of adverse Medical Staff decisions, including the right of the affected practitioner to be heard at each step of the process when requested by the affected practitioner[.]" Dr. Lohrmann argues that Memorial Hospital breached this bylaw provision by failing to provide Dr. Lohrmann with copies of the nurses' complaints and by failing to give Dr. Lohrmann notice of the 22 April 2002 Executive Committee meeting at which the complaints were considered. Dr. Lohrmann asserts that he was unaware that his care of Ms. S and Mr. W was the subject of the 22 April 2002 meeting, and therefore he had no opportunity to be heard at each step of the process.

The corporate bylaw provision that Dr. Lohrmann cites, however, does not apply to the process of investigating physician conduct. Rather, upon careful reading, the "process" to which the corporate bylaw provision refers is the process of formal hearing and appellate review subsequent to an adverse Executive Committee recommendation. The Executive Committee made no adverse recommendation until after the 22 April 2002 meeting. Therefore, any right to be heard guaranteed by the corporate bylaw that Dr. Lohrmann cites did not apply prior to that meeting.

Pursuant to the corporate bylaw cited, Memorial Hospital's medical staff bylaws provide that after an adverse medical staff recommendation, the medical staff practitioner is entitled to certain procedural rights. The practitioner is. entitled to: prompt written notice stating the reasons for an adverse recommendation by the Executive Committee; a hearing before a medical staff panel appointed by the president of the medical staff; a notice of hearing which shall again state the reasons for the adverse recommendation; the right to be accompanied and/or represented by counsel at the hearing; the right to submit memoranda concerning any issue of procedure or of fact; and the right to call and examine witnesses, to introduce written evidence, to cross-examine witnesses, to challenge witnesses, and to rebut any evidence. All of the foregoing procedures were complied

with in Dr. Lohrmann's case. He received written notice of the Executive Committee's recommendation in a letter from the CEO dated 24 September 2002, the day after the Executive Committee meeting. This letter detailed the reasons for the Executive Committee's recommendation. Dr. Lohrmann made a timely request for a hearing before the panel. At the panel hearing on 13 and 14 January 2003, Dr. Lohrmann was present and represented by counsel who called, examined and cross-examined witnesses.

Dr. Lohrmann also argues that a hearing by a panel, even if procedurally correct, does not cure Memorial Hospital's breach of bylaws in the prior investigatory process. Again, he cites *Virmani*. The facts of *Virmani*, however, are distinguishable from those of the present case. In *Virmani*, the physician was not allowed to participate at all in the investigatory peer review process, in violation of the hospital's bylaws which specified that a physician under investigation be provided an opportunity to respond to written queries from the investigatory peer review committee. *Virmani*, 127 N.C. App. at 71, 488 S.E.2d at 286. Because the hospital omitted a required step in its process, our Court in *Virmani* found that the physician was entitled to a new peer review investigation to be conducted in accordance with the hospital's bylaws. *Id.* at 78-79, 488 S.E.2d at 289. In the case before us, none of the investigatory steps provided by Memorial Hospital's medical staff bylaws were omitted. As discussed above, Memorial Hospital substantially complied with its medical staff bylaws concerning the request for corrective action. The process then continued in accordance with further bylaw provisions. Pursuant to Article VI, sections 1(b) and (c) of the medical staff bylaws, the investigating committee was formed when it became evident that the corrective action could be the suspension of Dr. Lohrmann's privileges, and Dr. Lohrmann was present for an interview with the investigating committee. In accordance with Article VI, Section 1(d), Dr. Lohrmann appeared before the Executive Committee prior to its taking action on the request and the investigating committee report. Unlike *Virmani*, there is no investigatory procedure left undone that could alter the outcome of another peer review upon remand in this case.

[4] On the issue of breach of contract, Dr. Lohrmann next argues that he was unable to fully and adequately defend himself at the January 2003 hearing because Memorial Hospital failed to inform him of all the charges he faced. Specifically, Dr. Lohrmann argues that he did not receive notice of any concern that his conduct caused "disruption," a term that first appeared in the panel's report of 18 February

2003. Dr. Lohrmann contends that in not specifying that he was charged with being disruptive, Memorial Hospital breached its bylaw provision requiring notice of specific activities or conduct that constitute the basis for a suspension. Dr. Lohrmann argues that in preparing his defense for the January 2003 hearing, he relied solely on the 18 September 2002 letter from the CEO, and prepared to defend charges of violating patient rights, specifically issues of medical ethics, advanced directives, and the right to die.

Although the letter of 18 September 2002 used the phrase "patients' rights," the letter also discussed issues of communication with family and physicians. Moreover, the 24 September 2002 letter from the CEO further particularized the issues pertaining to Dr. Lohrmann's conduct. The 24 September 2002 letter served as Dr. Lohrmann's notice of the Executive Committee's adverse recommendation of the previous day. This letter described in detail both the Executive Committee's reasons for voting to suspend Dr. Lohrmann's medical privileges and the charges that would be considered at the hearing, namely: (1) Dr. Lohrmann's failure to effectively coordinate with involved family members and physicians about the care of Ms. S, (2) Dr. Lohrmann's failure to obtain the concurrence of Mr. W's primary physician before changing the code status, and (3) Dr. Lohrmann's failure to enter an appropriate order to effect the change.

The panel, while noting that it "[took] exception to the Executive Committee's conclusion that patients' rights were violated," nevertheless concluded that "principles of medical ethics ha[d] been brought into question by Dr. L[ohrmann]'s conduct." The panel found that Dr. Lohrmann had a "disturbing disregard for the validity of patients' wishes as expressed through advanced directives, family contribution and input from other health care workers." Further, Dr. Lohrmann was "unwilling or unable to work with other health care personnel" which led to "confusion and disruption of standard medical care." It was "in regards to this disruption" that the panel focused its concerns.

Whether Dr. Lohrmann's conduct was labeled as a "disruption," "failure to effectively coordinate," "disturbing disregard for the validity of patients' wishes" or any of the other terms used by Dr. Falk, the investigating committee, the Executive Committee, or the panel, the issues concerning Dr. Lohrmann's manner of care of Ms. S and Mr. W were the same throughout the corrective action proceedings. As early as 26 August 2002, Dr. Lohrmann received notice that the investigating committee would be reviewing his con-

**LOHRMANN v. IREDELL MEM'L HOSP., INC.**

[174 N.C. App. 63 (2005)]

duct in caring for Ms. S and Mr. W. At Dr. Lohrmann's meeting with the investigating committee on 20 September 2002, Dr. Lohrmann was questioned about communication with family members and physicians, as well as his entry of a code order that might confuse nurses and physicians. While the CEO's letter of 18 September 2002 used the phrase "patients' rights," it also discussed issues of communication with family and physicians. At the very latest, the CEO's detailed letter of 24 September 2002 gave sufficient notice to afford Dr. Lohrmann an adequate opportunity to prepare a defense for the hearing scheduled for January 2003. We find that Dr. Lohrmann had sufficient notice of the charges against him to be able to present facts and defend his conduct at the January 2003 hearing.

## III.

**[5]** Dr. Lohrmann argues that the trial court erred in granting summary judgment for Memorial Hospital because the findings of fact set forth in the preliminary injunction dated 24 April 2003 gave rise to genuine issues of material fact. Dr. Lohrmann acknowledges that the findings in the preliminary injunction proceeding would not be binding at a subsequent trial on the merits, but he argues that they would support a judgment for plaintiff if uncontradicted. We find this argument to be without merit.

It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits. *Huggins v. Wake County Board of Education*, 272 N.C. 33, 40-41, 157 S.E.2d 703, 708 (1967). "Indeed, these findings and proceedings are not proper matters for the consideration of the court or jury in passing on the issues determinable at the final hearing." *Huskins v. Yancey Hospital, Inc.*, 238 N.C. 357, 362, 78 S.E.2d 116, 121 (1953). The purpose of an interlocutory injunction is to preserve the status quo of the subject matter of the suit until a trial can be held. *Id.* at 360, 78 S.E.2d at 119. The burden of proof required to support a preliminary injunction is less than that required for a motion for summary judgment, and the evidence is less complete. *See Schultz & Assoc. v. Ingram*, 38 N.C. App. 422, 248 S.E.2d 345 (1978). Accordingly, the trial court did not err in determining there was no genuine issue of material fact.

## IV.

**[6]** Dr. Lohrmann next argues that Memorial Hospital's corrective action against him was in violation of N.C. Gen. Stat. § 131E-85 (2003), which provides in part:

(a) The granting or denial of privileges to practice in hospitals to physicians . . . and the scope and delineation of such privileges shall be determined by the governing body of the hospital on a non-discriminatory basis. Such determinations shall be based upon the applicant's education, training, experience, demonstrated competence and ability, and judgment and character of the applicant, and the reasonable objectives and regulations of the hospital, including, but not limited to appropriate utilization of hospital facilities, in which privileges are sought.

. . . .

(c) In addition to the granting or denial of privileges, the governing body of each hospital may suspend, revoke, or modify privileges.

(d) All applicants or individuals who have privileges shall comply with all applicable medical staff bylaws, rules and regulations, including the policies and procedures governing the qualifications of applicants and the scope and delineation of privileges.

Dr. Lohrmann argues that Memorial Hospital had no grounds under N.C. Gen. Stat. § 131E-85 for suspending his privileges. He contends that Memorial Hospital sought to suspend his privileges solely on the basis of violating patients' rights, but that no such rights were violated. Dr. Lohrmann contends that he complied with the wishes of his patients and with North Carolina law regarding living wills and the right of a patient to control decisions relating to her or his medical care. Therefore, Dr. Lohrmann argues that Memorial Hospital's attempt to discipline him for following the law was in violation of stated North Carolina public policy, and as such violated N.C. Gen. Stat. § 131E-85.

Dr. Lohrmann bases this argument on the allegation that Memorial Hospital sought to suspend his privileges solely on the basis of violating patients' rights. As discussed above, other factors pertaining to Dr. Lohrmann's conduct were clearly at issue throughout the corrective action proceedings. Furthermore, N.C. Gen. Stat. § 131E-85 provides that a hospital may take into account the judgment and character of a physician, as well as the reasonable objectives and regulations of the hospital, in suspending a physician's privileges.

[7] Alternatively, Dr. Lohrmann argues that Memorial Hospital's decision to suspend him was arbitrary and capricious, based on irrelevant consideration and not upon the reasonable objectives and regulations of Memorial Hospital. By statute, regulation, and case law, the authority to make corrective action decisions rests with the governing body of a hospital. *See* N.C. Gen. Stat. § 131E-85; 10A NCAC 13B .3701, .3702, .3705 (June 2004); *Cameron v. New Hanover Memorial Hospital*, 58 N.C. App. 414, 293 S.E.2d 901 (1982). It is not the role of this Court to substitute our judgment for that of the hospital governing body, which has the responsibility of providing a competent staff of physicians under N.C. Gen. Stat. § 131E-85. *See Claycomb v. HCA-Raleigh Community Hosp.*, 76 N.C. App. 382, 333 S.E.2d 333 (1985). As long as the governing body's suspension of privileges is " 'administered with fairness, geared by a rationale compatible with hospital responsibility and unencumbered with irrelevant considerations, [this] [C]ourt should not interfere.' " *Cameron*, 58 N.C. App. at 449, 293 S.E.2d at 922 (quoting *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173, 177 (5th Cir. 1971). We find that Memorial Hospital's governing body met this standard.

First, our discussion of Memorial Hospital's compliance with its corporate and medical staff bylaws illustrates that the governing body's suspension of Dr. Lohrmann was administered with fairness. Next, the governing body's decision to suspend Dr. Lohrmann was geared by a rationale compatible with hospital responsibilities, namely to ensure full and adequate communication and cooperation with patients, families, physicians, and other medical personnel. Finally, Dr. Lohrmann makes no argument about irrelevant considerations.

We note that peer review proceedings such as Dr. Lohrmann's are conducted by committees of physicians and lay persons. As quasi-legal proceedings, such peer reviews are less formal than court proceedings and have been accorded a degree of deference by our Court. This Court has held that the evaluation of the performance of physicians " 'is best left to the specialized expertise of their peers, subject only to limited judicial surveillance.' " *Id.* To proceed otherwise would inhibit the vital role of the peer review process. Members of Dr. Lohrmann's peer committee and panel were specially situated to evaluate whether Dr. Lohrmann's conduct met the standard of care set by Memorial Hospital. The decision-making of the governing body relied on the findings of Dr. Lohrmann's peers and was fair and reasonable.

STATE ex rel. BANKING COMM'N v. WEISS

[174 N.C. App. 78 (2005)]

In light of the evidence and discussion above, we hold that there is no genuine issue of material fact as to whether Memorial Hospital breached its contractual bylaws with Dr. Lohrmann, that the findings of fact from the preliminary injunction were not binding on the trial court, and that Memorial Hospital's decision under N.C. Gen. Stat. § 131E-85 was proper. The trial court did not err in granting summary judgment in favor of Memorial Hospital.

Affirmed.

Judges HUNTER and LEVINSON concur.