Nat'l Surgery Ctr. Holdings, Inc. v. Surgical Inst. of Viewmont, LLC, 2016 NCBC 37.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 1003

NATIONAL SURGERY CENTER
HOLDINGS, INC.,

　　　　　　　Plaintiff,

v.

SURGICAL INSTITUTE OF
VIEWMONT, LLC, NUETERRA
HEALTHCARE MANAGEMENT, LLC,
DR. DAVID E. MELON, DR. WILLIAM
M. GEIDEMAN, and ROSS SCIMECA,

　　　　　　　Defendants.

**ORDER ON PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING
ORDER**

1.　　**THIS MATTER** is before the Court on Plaintiff National Surgery Center Holdings, Inc.'s ("Plaintiff") Motion for Temporary Restraining Order (the "Motion") in the above-captioned case.

2.　　Having considered Plaintiff's Motion, the briefs in support of and in opposition to the Motion, the Verified Complaint, appropriate evidence of record, and the arguments of counsel for the parties at a hearing held on Plaintiff's Motion on May 5, 2016, the Court hereby **GRANTS** the Motion, and **FINDS** and **CONCLUDES**, solely for the limited purposes of this Motion,[1] as follows:

FINDINGS OF FACT

I. Procedural History

3.　　Plaintiff filed its Complaint and Motion for Temporary Restraining Order against Defendants Surgical Institute of Viewmont, LLC ("Viewmont"), Nueterra Healthcare

---

[1] "It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits." *Lohrmann v. Iredell Mem'l Hosp., Inc*., 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) (citing *Huggins v. Wake Cnty. Bd. of Educ.*, 272 N.C. 33, 40–41, 157 S.E.2d 703, 708 (1967)).

Management, LLC ("Nueterra"), Dr. David E. Melon, Dr. William M. Geideman, and Ross Scimeca (collectively, "Defendants") on April 21, 2016, alleging claims for declaratory relief, breach of contract, and injunctive relief.

4. The case was designated a complex business case on April 22, 2016 and was assigned to the undersigned on April 25, 2016.

5. Plaintiff filed its brief in support of the Motion and supporting documents on April 26, 2016, and Defendants filed a brief in opposition to the Motion and supporting documents on May 4, 2016. The Court held a hearing on the Motion on May 5, 2016, at which all parties were represented by counsel.

## II. Relevant Facts

6. Viewmont is the owner and operator of Viewmont Surgery Center, a free-standing ambulatory surgery center in Hickory, North Carolina. In 2003, Frye Regional Medical Center, Inc. ("FRMC"), Nueterra, and a number of local surgeons (the "Practitioner Members") entered a joint venture to form Viewmont.

7. Viewmont's organizational structure is governed by Viewmont's Operating Agreement (the "Operating Agreement"). Prior to the transaction at issue in this case, FRMC was the "Founding Member" of Viewmont, as that term is defined in the Operating Agreement. Under the Operating Agreement, Viewmont's Board of Managers (the "Board of Managers") is comprised of five individuals: two representatives of the Founding Member, two representatives of the Practitioner Members, and one representative of Nueterra.

8. Prior to June 16, 2015, FRMC owned approximately 55% of Viewmont's equity interest. On June 16, 2015, FRMC transferred all of its ownership interest in Viewmont to HCN

Surgery Center Holdings, Inc., a subsidiary of Tenet Healthcare Corporation. Subsequently, HCN Surgery Center Holdings, Inc. transferred the same ownership interest in Viewmont to Plaintiff.

9. On February 23, 2016, Defendants met and voted to exercise an option to repurchase Plaintiff's ownership interest in Viewmont.[2] Plaintiff alleges that this vote was in contravention of section 6.6 of the Operating Agreement and invalid under sections 2.2(b)(i) and 6.6 of the Operating Agreement.

10. On March 11, 2016, Defendants sent a letter, on behalf of Viewmont, to Plaintiff indicating Defendants' view that FRMC's transfer of its ownership interest to Plaintiff was not authorized or permitted by the Operating Agreement, and that the transfer constituted a Terminating Event under section 12.1(a)(iv) of the Operating Agreement. Included with the letter was (i) a check in the amount of $180,759.00 representing ten percent of FRMC's capital account balance, and (ii) a promissory note for the remaining ninety percent of the balance, each, Defendants contend, as provided in section 12.4.

11. Attorney Scott C. Palecki, purportedly on behalf of Viewmont and Nueterra, has sent letters to third-parties, including Viewmont's in-network insurance providers, stating, among other things, that Plaintiff and its affiliated entities no longer have any ownership interest in Viewmont, and, in so doing, has attempted to alter existing contractual relationships between Plaintiff and these third parties.

12. Section 9.5 of the Operating Agreement provides that "[t]he Founding Member . . . may assign all or any portion of its interest in [Viewmont] to an Affiliate . . . without the consent

---

[2] As explained herein, Defendants contend that FRMC only assigned its rights to receive distributions and profits to Plaintiff because FRMC failed to obtain the written consent of the Board of Managers to the transfer. As a result, Defendants contend FRMC's ownership interest was not transferred to Plaintiff and thus that Viewmont purchased the ownership interest from FRMC, not Plaintiff. Plaintiff contends that FRMC transferred all of its rights in its Member Units to Plaintiff because Section 9.5 of the Operating Agreement permitted the transfer to Plaintiff as FRMC's "Affiliate."

of the Members." Affiliate is defined under the Operating Agreement as "any person or entity that directly or indirectly controls, is controlled by, or is under common control with the referenced person or entity . . . ."

13. Section 9.1 of the Operating Agreement provides:

> A Member's interest in the Company may not be sold, transferred, assigned, conveyed, pledged, encumbered or otherwise disposed of, voluntarily or involuntarily, by operation of law or otherwise (a "Disposition") without the written consent of the Board of Managers. An assignee of any interest in the Company shall become a substituted Member only in accordance with Sections 9.2 and 9.3 below. Any assignee who does not become a substituted Member . . . shall have no right to . . . vote on any of the matters as to which a Member would be entitled to vote hereunder. An assignee who does not become a substituted Member shall be entitled only to receive the share of the profits or other compensation by way of income, or the return of capital contribution, to which his or her assignor would otherwise be entitled. If the assignee does not become a substituted Member, the assignor shall continue to be a Member and owner of the Unit(s).

14. Sections 9.2 and 9.3 of the Operating Agreement provide that an assignee shall have the right to become a substituted Member only if, among other things, "the Board of Managers . . . consents to the assignee's becoming a substituted Member[.]"

15. Section 2.1 of the Operating Agreement provides that "[t]he term 'Member' or 'Members' includes the Founding Member and all Members."

16. Section 12.1 of the Operating Agreement provides Viewmont with the option to purchase all of the Units of that Member upon a number of "Terminating Events." One of the Terminating Events is defined as "[a]ny gift, distribution, dividend, transfer or other Disposition of Units by a Member not specifically authorized by or in accordance with this Agreement[.]"

17. Section 6.6 of the Operating Agreement provides that "[t]he Members and the Board of Managers shall have no right or authority to remove the Founding Member."

18. Plaintiff seeks a temporary restraining order ("TRO") to prevent Defendants from selling or otherwise disposing of the membership interest in Viewmont that Viewmont contends it

has repurchased from FRMC, from communicating to third parties that Viewmont has repurchased the FRMC membership interest, or to take any action to encourage third parties to alter their contractual relationship concerning Viewmont.

## CONCLUSIONS OF LAW

19. The purpose of a TRO is to preserve the status quo between the parties until such time as a motion for preliminary injunction can be properly heard. *See Lambe v. Smith*, 11 N.C. App. 580, 582, 181 S.E. 2d 783, 784 (1971) (stating that a TRO is utilized "to preserve the status quo until the motion for preliminary injunction can . . . be brought for hearing and decision.").

20. The issuance of a TRO "is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (citation omitted). Immediate injunctive relief "will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Id.* at 401, 302 S.E.2d at 759–60 (citation omitted).

21. As to the first question, our Supreme Court has explained that likelihood of success on the merits means a "reasonable likelihood." *Id.* at 404, 302 S.E.2d at 761. As to the second question, "the trial court's . . . inquiry is not limited to the question of irreparable injury. The injunction will issue if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Id.* at 405, 302 S.E.2d at 761–62 (emphasis removed) (internal quotation marks and citation omitted).

22. North Carolina courts have held that in assessing the TRO or preliminary injunction factors, the trial judge "should engage in a balancing process, weighing potential harm to the

plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted. In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

23. A party may show that it will suffer "irreparable injury" for which it has no adequate remedy at law where damages are difficult and cannot be ascertained with certainty. *See, e.g.*, *A.E.P. Indus.,* 308 N.C. at 406–07, 302 S.E.2d at 762 ("[O]ne factor used in determining the adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach."). The burden is on the moving party to establish its right to a temporary restraining order, and the remedy "should not be lightly granted." *Old Battleground Props. v. Cent. Carolina Surgical Eye Assocs., P.A.*, 2015 NCBC LEXIS 19, at *18 (N.C. Super. Ct. Feb. 25, 2015) (citations and quotations omitted).

24. Plaintiff alleges that, as a result of FRMC's June 16, 2015 transfer, which Plaintiff contends was to an "Affiliate" and thus permitted without consent of the Board, Plaintiff became the Founding Member of Viewmont, and assumed all of the rights and interests of the Founding Member under the Operating Agreement. Accordingly, Plaintiff alleges that Defendants have violated the Operating Agreement by, among other things, voting to exercise the option to repurchase Plaintiff's alleged membership interest in Viewmont. Plaintiff points to section 6.6 of the Operating Agreement, which specifically states, as outlined above, that neither the Members nor the Board of Manager shall have the "right or authority to remove the Founding Member."

25. Defendants contend in response that they followed the structure of the Operating Agreement precisely. According to Defendants, FRMC purported to assign its interest in Viewmont to Plaintiff without the consent of Viewmont's Board of Managers, in violation of

section 9.1 of the Operating Agreement. As a result, Defendants argue that such transfer caused a "Terminating Event" under section 12.1, and a majority of the Board of Managers thereafter properly voted to exercise Viewmont's option to repurchase FRMC's ownership interest under sections 12.1 and 12.2. Further, according to Defendants, while Plaintiff was an "assignee" of FRMC's interest in Viewmont, Plaintiff did not become a "substituted Member" of Viewmont under the express terms of the Operating Agreement, and therefore only retained an interest in Viewmont's distributions and profits.

26. As an initial matter, the Court notes that there is considerable tension in the terms of the Operating Agreement as those terms apply to Defendants' actions against the Founding Member here.

27. Section 2.1 of the Operating Agreement expressly states that the Founding Member is a Member of Viewmont, and section 9.1 states without qualification that a Member's interest in Viewmont "may not be sold, transferred, assigned, conveyed, pledged, encumbered or otherwise disposed of, voluntarily or involuntarily, by operation of law or otherwise (a "Disposition") without the written consent of the Board of Managers." It is undisputed that FRMC did not obtain the written consent of the Board to assign or transfer its interest in Viewmont.

28. The Operating Agreement further recognizes that an assignee of a Member's interest will simply obtain an interest in Viewmont's distributions and profits unless the terms of sections 9.2 and 9.3 are satisfied such that the assignee becomes a "substituted Member." One of the requirements of section 9.2 and 9.3 is that the Board consent to the assignee becoming a "substituted Member." Again, it is undisputed that the Board did not consent to Plaintiff becoming a "substituted Member" under the Operating Agreement.

29.     Accordingly, it would appear from a focused review of sections 2.1, 9.1, 9.2, and 9.3 that FRMC's disposition of its interest to Plaintiff was in violation of the Operating Agreement, and thus that section 12.1 permitted Viewmont to purchase FRMC's ownership interest, effectively removing FRMC from Viewmont.

30.     Section 9.5—relied upon by Plaintiff and which permits the Founding Member to "assign all or any portion of its interest in the Company to an Affiliate . . . without the consent of the Members"—does not change this analysis.  First, although the Court recognizes that Plaintiff's status as an "Affiliate" apparently will be vigorously contested, the Court nonetheless concludes that, based on the evidence presented, Plaintiff has established a reasonable likelihood of success in showing that Plaintiff was an "Affiliate" of FRMC under section 2.1 of the Operating Agreement.  Therefore, the Court concludes for present purposes that FRMC was entitled to assign its interest to Plaintiff without the consent of Viewmont's Members.  Section 9.5 does not provide, however, that such an assignment was permitted "without the consent of the Board of Managers," and thus does not clearly exempt the Founding Member from sections 9.1, 9.2 and 9.3, as argued by Plaintiff.

31.     Section 6.6 of the Operating Agreement, however, states unequivocally that "[t]he Members and the Board of Managers shall have no right or authority to remove the Founding Member."  The Operating Agreement does not contain language such as "except as otherwise provided herein," "except as provided under section 12.1," or "subject to the occurrence of a 'Terminating Event,'" and instead contains numerous provisions that contemplate the ongoing, active participation of the Founding Member in Viewmont.  For example, section 2.2(a) contemplates that the Founding Member will have two representatives on the Board of Managers, and section 2.2(b) provides that the Board of Managers cannot undertake certain significant

company actions without the affirmative vote of at least one of the Founding Member's representatives. Section 14 provides the Founding Member a unilateral right to declare in good faith that a "substantial or material legal risk" exists and thereby compel the repurchase of Member Units. Section 15.4 provides the Founding Member a unilateral right to amend the Operating Agreement in certain situations. Section 15.15 permits the Founding Member to take all actions necessary to require Viewmont to comply with Tenet Healthcare Corporation's corporate compliance policies and procedures. Indeed, Defendants' counsel acknowledged at the hearing that FRMC's removal from Viewmont through Defendants' actions will require the Operating Agreement to be amended, a result not identified or forecasted within the four corners of the Operating Agreement from the application of its terms and a tacit recognition that the participation of the Founding Member is fundamental to Viewmont's structure.

32. Accordingly, based on the record currently before the Court, it appears that section 6.6 of the Operating Agreement is the clearest statement of the intent of the contracting parties as it relates to the specific conduct at issue here. While Defendants' proffered construction certainly appears consistent with the terms of the Operating Agreement, the Court concludes that only section 6.6 directly and specifically addresses Defendants' specific challenged action—the removal of the Founding Member—and section 6.6 expressly and unequivocally states that the Members and the Board of Managers do not have authority to accomplish the specific action implemented by Defendants here. *See generally Wood-Hopkins Contracting Co. v. N.C. State Ports Auth.*, 284 N.C. 732, 738, 202 S.E.2d 473, 476 (1974) ("[W]hen general terms and specific statements are included in the same contract and there is a conflict, the general terms should give way to the specifics."); Restatement (Second) of Contracts § 203(c) ("specific terms and exact terms are given greater weight than general language").

33. Accordingly, the Court concludes, based on the record before the Court and in the exercise of its discretion, that Plaintiff has demonstrated a reasonable likelihood of success on the merits on its claims for declaratory judgment and breach of contract.

34. It further appears to the Court that, based on the evidence and other submissions of record, a TRO is necessary for the protection of Plaintiff's rights, to prevent irreparable harm to Plaintiff, and to maintain as nearly as possible the status quo until Plaintiff's Motion for Preliminary Injunction may be heard by the Court.

35. The Court has engaged in a balancing process, weighing potential harm to Plaintiff if this TRO is not issued against the potential harm to Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiff outweighs that to Defendants, the balance of the equities and the ends of justice support granting this TRO, and a TRO in this case is not adverse to the public interest.

36. The Court therefore concludes that a TRO should issue and, accordingly, that the Motion for TRO should be granted.

37. Pursuant to Rule 65(c) of the North Carolina Rules of Civil Procedure, and as a condition of this Order, the Court concludes that a bond of $25,000 is a proper security in connection with Plaintiff's request for and the Court's grant of a temporary restraining order, without prejudice to either party's right to request that the bond be increased or decreased for good cause shown.

38. **WHEREFORE**, the Court **GRANTS** the Motion and enters the following Temporary Restraining Order as follows:

    a. During the term of this Order, Defendants, and those acting on their behalf, shall not:

i. advertise, offer for sale, negotiate for the sale of, or otherwise take any actions to sell the membership interest in Viewmont that is at issue in this litigation, to wit, the membership interest that Viewmont purports to have repurchased from FRMC;

ii. communicate to any third-parties the position that Plaintiff's (or FRMC's) membership interest in Viewmont has been repurchased and Plaintiff (or FRMC) is no longer a Member of Viewmont; or

iii. take any action to request or otherwise encourage any third party person or entity to alter the terms of their contractual relationships with respect to Viewmont.

b. Pursuant to the provisions of Rule 65(c), and as a condition of this Order, Plaintiff shall post security in the amount of $25,000.00 in the form of cash, check, surety bond or other undertaking satisfactory to the Catawba County Clerk of Superior Court.

c. The terms and conditions of this Order shall be in force and take effect immediately upon Plaintiff's posting of security as provided herein.

d. This TRO will expire at 5:00 PM on May 23, 2016 unless modified, extended, or dissolved by the Court. Absent a showing of undue prejudice, the Court presently anticipates exercising its discretion under Rule 65(b) to extend the TRO for a further 10-day period by separate order, thus extending the TRO through and including 5:00 PM on June 2, 2016.

e. Unless otherwise ordered, the parties shall appear before this Court at 2:00 PM on June 1, 2016, in Courtroom 6370 at the Mecklenburg County Courthouse, 832 East

Fourth Street, Charlotte, North Carolina 28202 to determine whether this Order should be converted into a preliminary injunction, and if so, whether the terms should be modified in any respect.

f. The Court directs the parties to (i) cooperate in proposing alternative dates and times for the hearing on Plaintiff's motion for preliminary injunction should other dates and times be more convenient to counsel, (ii) offer by May 16, 2016 a proposed schedule for further briefing on the motion, and (iii) consider an extension by consent of the TRO pending the Court's resolution of Plaintiff's motion for preliminary injunction.

**SO ORDERED**, this the 12th day of May, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases