Window Gang Ventures, Corp. v. Salinas, 2018 NCBC 18.

STATE OF NORTH CAROLINA

CARTERET COUNTY

WINDOW GANG VENTURES,
CORP.,

      Plaintiff,

v.

GABRIEL SALINAS; THE GANG
GROUP, LLC; and WINDOW
NINJAS, LLC,

      Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 107

**ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

1. **THIS MATTER** is before the Court upon Plaintiff Window Gang Ventures, Corp.'s ("Window Gang" or "Plaintiff") Motion for Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure in the above-captioned case.

2. Having considered the Motion, the briefs, exhibits, and affidavits in support of and in opposition to the Motion, and the arguments of counsel at the hearing on the Motion on February 16, 2018, the Court hereby **GRANTS in part and DENIES in part** the Motion as set forth herein.

> *Bell, Davis & Pitt, P.A., by Jason B. James, Joshua B. Durham and Derek M. Bast, for Plaintiff Window Gang Ventures, Corp.*
>
> *Hodges Coxe Potter & Phillips, LLP, by C. Wes Hodges, II, Bradley Coxe and Samuel B. Potter, for Defendants Gabriel Salinas, the Gang Group, LLC, and Window Ninjas, LLC.*

Bledsoe, Judge.

## I.

## PROCEDURAL HISTORY

3. Plaintiff filed its Verified Complaint ("Complaint") initiating this action on February 1, 2018, asserting claims against Defendants Gabriel Salinas ("Salinas"), a long-time franchisee of Plaintiff, and Salinas's two companies, The Gang Group, LLC ("Gang Group") and Window Ninjas, LLC ("Window Ninjas") (collectively, "Defendants"), arising out of Salinas's alleged conduct following the termination of Salinas's franchise relationship with Plaintiff on December 15, 2017. Specifically, Plaintiff asserts claims against some or all Defendants for breach of contract, conversion, unjust enrichment, unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, misappropriation of trade secrets, tortious interference with contract, tortious interference with prospective economic advantage, punitive damages, and injunctive relief under Rule 65.

4. On the same day Plaintiff filed the Complaint and upon Plaintiff's application, Superior Court Judge John E. Nobles, Jr. issued a temporary restraining order ("TRO"), *ex parte*, restraining Defendants in certain respects and scheduling a hearing "for further determination of this matter" for 9:00 AM on February 7, 2018. (TRO 3, ECF No. 4.) The TRO restricted Defendants from using Plaintiff's "Marks, likeness, good will, customer lists, Trade Secrets and proprietary systems and processes as defined in the Complaint and from soliciting or interfering with Window Gang, its customers, or contacts." (TRO 1.) In addition, the TRO enjoined Salinas from directly competing against Plaintiff and ordered Defendants to immediately stop using certain phone numbers that belonged to Plaintiff. (TRO 1–2.)

5.     On February 2, 2018, Defendants filed a Notice of Designation in the North Carolina Business Court. A Designation Order was entered on February 5, 2018, and the case was assigned to the undersigned on February 6, 2018. Upon entry of the Designation Order, all further proceedings in this action were required to come before this Court as provided in N.C. Gen. Stat. § 7A-45.4(f) and Business Court Rule 7.13. As a result, Plaintiff's motion for preliminary injunction was not brought on for hearing before Judge Nobles on February 7, 2018. The Court held a status and scheduling conference by telephone with all counsel of record on February 9, 2018.

6.     Consistent with the Court's February 9, 2018 Scheduling Order, Plaintiff filed the Motion on February 13, 2018, seeking a preliminary injunction enjoining Defendants from (i) using any mark associated with Window Gang; (ii) using any telephone number that was previously associated with any Window Gang franchise operated by Salinas or the other Defendants; (iii) representing to any person or entity that Window Ninjas is a successor-in-interest to, a continuation of, or the same entity as Window Gang; (iv) making use of Window Gang's confidential and trade secret information; (v) competing against Window Gang in certain restricted areas; and (vi) soliciting Window Gang's customers.

7.     The TRO is no longer in effect. The Motion has been fully briefed, and the Court held a hearing on the Motion on February 16, 2018 at which all parties were represented by counsel. The Motion is now ripe for resolution.

II.

FINDINGS OF FACT

8.  Having considered the affidavits, briefs, arguments, and supporting materials presented to the Court, the Court makes the following FINDINGS OF FACT for the limited purpose of resolving the Motion.[1]

9.  Plaintiff Window Gang is a North Carolina corporation with its principal office and place of business in Carteret County.  (Compl. ¶ 1, ECF No. 3.)

10.  Defendant Salinas is a resident of New Hanover County.  (Compl. ¶ 2.)

11.  Defendant Gang Group is a North Carolina corporation with its principal office and place of business in New Hanover County, and Salinas is the President of Gang Group.  (Compl. ¶ 3; Salinas Aff. ¶ 2, ECF No. 23.)

12.  Defendant Window Ninjas is a North Carolina limited liability company with its principal office and place of business in New Hanover County.  (Compl. ¶ 4.)

13.  Window Gang is engaged in the business of residential, commercial, industrial and high-rise cleaning services, including window cleaning, blind cleaning, gutter cleaning, window tinting, chimney sweeping, dryer vent cleaning, roof washing, oil remediation, no slips flooring, and low and high pressure spray applications.  (Compl. ¶ 6.)  Window Gang provides these services in twenty states across the country and has been in business for over thirty years.  (Compl. ¶¶ 7–9.) Each exclusive outlet/territory is operated as a company-owned business or by a

---

[1] This Court is not bound at a trial on the merits by the findings of fact made in a preliminary injunction order. *Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) (citing *Huggins v. Wake Cty. Bd. of Educ.*, 272 N.C. 33, 40–41, 157 S.E.2d 703, 708 (1967)).

Window Gang franchisee that is specifically authorized to conduct business as Window Gang. (Compl. ¶ 7.)

A. The Franchise Agreement

14. On or about July 22, 1997, Defendant Salinas entered into a Franchise Agreement (the "1997 Agreement") which granted him the exclusive right to operate a Window Gang franchise in Wilmington, North Carolina and nearby counties for a period of ten years. (Compl. ¶ 13; Pl.'s Suppl. Statement Supp. Mot. Prelim. Inj. Ex. A [hereinafter "1997 Agreement"], at Ex. G, ECF No. 25.1.)

15. On or about June 10, 2007, Salinas, individually and on behalf of Defendant Gang Group (collectively hereafter, "Salinas"), entered into a renewal Franchise Agreement with Plaintiff extending the franchise through June 10, 2017 (the "Franchise Agreement"). (Compl. ¶ 18.) The Franchise Agreement specifically provides that Plaintiff granted Salinas a "non-exclusive license . . . to operate one franchised Outlet under the Marks at a location specified [as '1509 Ann Street, Beaufort, North Carolina 28516'] within the territory specified [as 'the Wilmington NC area']." (Compl. Ex. 1 § 2.1 [hereinafter "Agreement"], ECF No. 1.)

16. The Franchise Agreement contains a confidentiality provision, under which Salinas agreed as follows:

> You acknowledge that Your knowledge of the operation of a WINDOW GANG Franchise will be derived from the information disclosed to You by Us pursuant to the franchise and that certain information, including without limitation the contents of the Operations Manual and specifications, standards and operation procedures of the WINDOW GANG Franchise is proprietary, confidential and a trade secret of WINDOW GANG. You agree that You will maintain the absolute confidentiality of all such information during and after the term of the Franchise and will not use, divulge, reproduce or exhibit to any person

other than employees and only to the extent necessary for the operation of the WINDOW GANG Franchise in accordance with this Agreement, any portion of the WINDOW GANG Confidential Operations Manual or use any such information in any other business or in any manner not specifically authorized or approved in writing by Us.

. . . You, either during the term of this Agreement or at any other time thereafter, shall [not] communicate, divulge or use for [Your] benefit … not in conjunction with this Franchise, or [to the benefit of] any other person, partnership, association or corporation, any confidential information, knowledge or know-how concerning the methods of operation of the Franchise Business hereunder, which may be communicated to You. . . . Any and all information, knowledge and know-how used in or related to the WINDOW GANG Franchise which We communicate to You . . ., including without limitation, contents of the Manual, specifications, techniques, training materials, operation procedures, tapes and films, computer software, client lists and other data shall be deemed confidential for purposes of this Agreement. Neither You nor any other person who is actively involved in a managerial or supervisory position with You nor any employee who will operate, manage or do any work in connection with the operation of the Franchise shall at any time, without Our prior written consent, use, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make the same available to any unauthorized persons.

(Agreement § 12.1.)

17. Salinas also agreed in the Franchise Agreement that "WINDOW GANG is the owner of all Names and Marks licensed to [him] by this Agreement," that Salinas's right to use such Names and Marks "derived solely from [the] Agreement," and that the "Names and Marks and any goodwill established thereby shall inure to the exclusive benefit of WINDOW GANG."  (Agreement § 13.1.)

18. Significantly for the current Motion, Salinas further agreed in the Franchise Agreement that "after the termination or expiration of this Franchise [he would] not identify [him]self, or any Outlet, or any other business as a WINDOW GANG

franchise, a former WINDOW GANG franchise or franchised Outlet, or as a Franchisee otherwise associated with [Plaintiff], or use in any manner or for any purpose any Name or Mark or other indicia of a WINDOW GANG franchise." (Agreement § 13.1.) Consistent with this provision, Salinas also agreed that "upon termination or expiration of the Franchise," he would return to Plaintiff "all signs, catalogues, advertising materials, forms, invoices, and other materials containing the WINDOW GANG Names and the Marks or otherwise relating to the Franchise[.]" (Agreement § 16.3.)

19.     The Franchise Agreement further provides that Plaintiff has the "sole right to and interest in the telephone numbers and directory listings associated with the Names and Marks or the Franchise," and that Salinas would "notify the telephone company and all listing agencies of the termination or expiration of [his] right to use any telephone number and any regular Yellow Page or other telephone directory listings or advertising associated with the Names and Marks or with the Franchise and to authorize transfers of the same to [Plaintiff]." (Agreement § 16.3.)

20.     Also of relevance here, the Franchise Agreement contains a covenant not to compete, providing that, for a period of two years after the termination or expiration of the Franchise Agreement, Salinas would not:

> have any interest as an owner . . . partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any other business conducting residential or commercial cleaning services . . . which is the same, similar to or competitive with [Plaintiff] and the Window Gang Franchise System within a radius of 50 miles of [Salinas's] Operating Territory. (Agreement § 16.5.)

The Franchise Agreement designates Salinas's Operating Territory as the "Wilmington, NC area[.]" (Agreement Ex. A.)

21. In addition to the non-compete, the Franchise Agreement also contains a covenant not to solicit customers, stating simply that Salinas is "not permitted to solicit customers and/or advertise outside the defined Operating Territory." (Agreement § 7(q).) A form agreement between Salinas and his employees, attached as Exhibit C to the Franchise Agreement and not signed by any employee, also provides that Salinas's employees shall not, while "employed by Franchisee," "[d]ivert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any [WINDOW GANG] business to any competitor[,] . . . [e]mploy or seek to employ any person who is at the time employed by [Plaintiff] or any franchisee of [Plaintiff], or otherwise directly or indirectly induce such person to change any existing relationship." (Agreement Ex. C, at 3.) That same form agreement also contains a non-compete similar to the non-compete at section 16.5 of the Franchise Agreement.

22. In addition to operating a franchise in the Wilmington, North Carolina territory, Salinas also operated, pursuant to separate oral agreements with Plaintiff, Window Gang franchises in Jacksonville, North Carolina; Charleston, South Carolina; Columbia, South Carolina; Greenville-Spartanburg, South Carolina; Myrtle Beach, South Carolina; Nashville, Tennessee; Hampton, Virginia; Richmond, Virginia; and Virginia Beach, Virginia (collectively, the "Later Franchises"). (Compl. ¶¶ 25–27; Salinas Aff. ¶ 20; McCullen Aff. ¶ 11, ECF No. 15.) As he did with his

Wilmington franchise, Salinas paid a franchise fee and made royalty payments to Plaintiff in connection with each of the Later Franchises. (Compl. ¶ 25; McCullen Aff. ¶ 11.)

23. The Franchise Agreement expired by its terms on June 10, 2017, although Salinas and Window Gang continued renewal negotiations for several months and Salinas continued to make royalty payments in accordance with the Franchise Agreement through September 2017. (McCullen Aff. ¶ 13; Salinas Aff. ¶¶ 42–48.) Window Gang and Salinas ultimately did not reach any agreements to further extend their franchise relationship at any location. (McCullen Aff. ¶ 13; Salinas Aff. ¶ 48.)

B. Termination of Window Gang Affiliation and Creation of Window Ninjas

24. On December 15, 2017, Salinas cancelled his affiliations with Window Gang and started operating his franchises under the name Window Ninjas. (Salinas Aff. ¶¶ 49–50.)[2] Window Ninjas is a completely separate company from Plaintiff and is Plaintiff's direct competitor in locations in which they both operate.

25. On December 16, 2017, Salinas sent emails to Plaintiff's customers introducing Window Ninjas, identifying himself as Window Ninjas's owner, and suggesting that Window Ninjas was simply Window Gang with a new and improved name and logo:

> It is with great excitement that we would like to introduce you to Window Ninjas! You knew us before as Window Gang. We may have a new and improved name and logo, however our excellent staff, management team, and leadership remain the same. You can rest assured that we will continue to give our customers the quality and

---

[2] Salinas's wife, Melissa Salinas, executed Article of Organization for Window Ninjas on December 18, 2017. (McCullen Aff. ¶ 14.)

service you have come to expect from us. When you see the new Window Ninjas logo, you will automatically know that you are choosing the best in the business!

(Compl. Ex. 3.)

26. On December 18, 2017, Window Ninjas personnel emailed Window Gang's customers with a materially identical statement and requested that the customers direct their future inquiries to Window Ninjas. (McCullen Aff. Ex. 7, ECF No. 15.7.)

27. At this same time and continuing thereafter, Window Ninjas represented to Window Gang customers and the general public that Window Ninjas is "formerly Window Gang." (Salinas Suppl. Aff. ¶ 7, ECF No. 24.)

28. Defendants changed the Window Gang franchises' Facebook pages into Window Ninjas pages. (McCullen Aff. ¶ 24.) As of February 16, 2018, Window Ninjas featured customer reviews on its Facebook and Google webpages that customers had posted for work performed by Window Gang but that Defendants attributed to Window Ninjas. (*See* McCullen Aff. Exs. 15–16, ECF Nos. 15.15–15.16.)

29. Window Gang customers have, as a result of Window Ninjas's representations, expressed to Window Gang that they are confused as to Window Ninjas's and Window Gang's identities. (Compl. ¶ 50, Ex. 7.)

30. While he was a franchisee, Salinas created a personal Gmail account using a Window Gang mark, windowgangwilmington@gmail.com, and he caused Window Gang's customer information to be automatically sent to this email address. (McCullen Aff. ¶ 10; McCullen Aff. Ex. 3, ECF No. 15.3.) Since terminating his relationship with Window Gang, Salinas has continued to use the Gmail account and its contents. (McCullen Aff. ¶ 15, Ex. 7.)

31. Window Ninjas continues to use the telephone numbers that were associated with Window Gang prior to the termination of the parties' relationship. (Compl. ¶ 38; McCullen Aff. ¶ 21; McCullen Aff. Exs. 11, 14, ECF Nos. 15.11, 15.14.) Telephone calls made to Window Gang numbers used by Salinas during his relationship with Plaintiff are currently routed to Window Ninjas. (Salinas Suppl. Aff. ¶ 13.)

32. Salinas has sent at least one invoice to customers for work performed by Window Gang that bears the Window Gang logo but directs that payment be made to Window Ninjas at Window Ninjas's address. (McCullen Aff. ¶ 17; McCullen Aff. Ex. 8, ECF No. 15.8.)

33. The parties disagree over the extent to which Defendants have sought to correct misrepresentations they have made to customers suggesting that Window Ninjas is in fact Window Gang.

34. Window Ninjas is pursuing, and has pursued, many of the same opportunities and customers that Salinas and his employees pursued while affiliated with Window Gang.

35. Salinas did not return to Plaintiff, and continues to possess, a Quickbooks file that contains the entire order and billing history for the customers that Salinas served during his relationship with Window Gang. (McCullen Aff. ¶ 29.)

36. Salinas has not returned certain of Window Gang's confidential materials, including its service manuals and other company manuals. (McCullen Aff. ¶ 30.)

37. Salinas now operates a Window Ninjas location in each market where he formerly operated a Window Gang franchise. (Compl. ¶ 34; McCullen Aff. Ex. 11.)

III.

CONCLUSIONS OF LAW

38. BASED UPON the foregoing FINDINGS OF FACT, the Court makes the following CONCLUSIONS OF LAW:

39. "[A] preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983). A preliminary injunction is proper only:

> (1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*Id.* at 401, 302 S.E.2d at 759–60 (emphasis omitted). The burden is on the moving party to establish its right to a preliminary injunction, and the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *17 (N.C. Super. Ct. Sept. 29, 2011); *see also Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E2d 478, 483 (1976) ("An injunction is an extraordinary remedy and will not be lightly granted.").

40. North Carolina courts have held that in assessing the preliminary injunction factors, the trial judge should "engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted. In effect, the harm alleged by

the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

41.    Irreparable injury under Rule 65 is established upon a showing that "the injury is beyond the possibility of repair or possible compensation in damages" or "that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P. Indus., Inc.*, 308 N.C. at 407, 302 S.E.2d at 763 (emphasis omitted) (citing *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949)).

42.    If there is a "full, complete and adequate remedy at law," the moving party is not entitled to the equitable remedy of injunction. *Bd. of Light and Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980). "[O]ne factor used in determining the adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach." *A.E.P. Indus., Inc.*, 308 N.C. at 406–07, 302 S.E.2d at 762.

A.  Breach of Contract: Use, Non-Disclosure, and Return Provisions

43.    A breach of contract requires the existence of a valid existing contract and a breach of the terms of that contract. *J.T. Russell & Sons, Inc. v. Silver Birch Pond LLC*, 217 N.C. App. 290, 295, 721 S.E.2d 699, 703 (2011) (citing *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005)).

44.    The Franchise Agreement is a valid and binding contract, and the confidentiality obligations and provisions restricting Salinas's use of Window Gang's

name, marks, and telephone numbers are binding. Although the Franchise Agreement assigns Salinas the "Wilmington, NC area" as his Operating Territory and does not address the Later Franchises, the Franchise Agreement does not limit Salinas's obligations concerning Plaintiff's name, marks, and telephone numbers to only those used in connection with the Wilmington franchise.

45. In particular, the Franchise Agreement provides, in relevant part, as follows:

> You will return to [Window Gang] all . . . materials containing the Window Gang Names and Marks *or* otherwise relating to the Franchise . . . You further agree that You will notify the telephone company and all listing agencies of the termination or expiration of Your right to use any telephone number . . . associated with the Names and Marks *or* with the Franchise[.]

(Agreement § 16.3 (emphasis added).) Applying standard rules of contract construction, the Court concludes that the disjunctive "or" in these provisions indicates that the parties intended that upon termination of the franchise relationship, Salinas should be prohibited from using Plaintiff's names, marks, or telephone numbers wherever he might have chosen to do so, and not simply in connection with his franchise in Wilmington. Accordingly, the Franchise Agreement's express terms prohibit Salinas from using the Window Gang names, marks, and telephone numbers wherever used, including in any location where Salinas may operate Window Ninjas.

46. Section 16.3 of the Franchise Agreement requires Salinas to return to Window Gang "all signs, catalogues, advertising materials, forms, invoices and other materials containing the WINDOW GANG Names and Marks or otherwise relating

to the Franchise." Section 12.1 of the Franchise Agreement prevents Salinas from using or divulging to third parties Plaintiff's proprietary and confidential information, "including without limitation the contents of the Operations Manual and specifications, standards and operation procedures of the WINDOW GANG Franchise," as well as "training materials, operation procedures, client lists and other data" (collectively, the "Protected Information").

47. Based on the Court's findings of fact on the current record, the Court concludes that Plaintiff has established a likelihood of success on the merits on its claim against Salinas for breach of contract by presenting persuasive evidence that the Franchise Agreement is a valid and binding contract and that Salinas has engaged in conduct in breach of that Agreement by (i) using Plaintiff's name, marks, and telephone numbers at each of the Window Gang locations that he now operates as Window Ninjas and (ii) failing to return to Plaintiff the Protected Information, including without limitation the manuals and other training materials provided to Salinas.

48. The Court, however, cannot conclude at this stage that Plaintiff has established a likelihood of success on its claim against Salinas for breach of contract based on his failure to return the Quickbooks file containing the order and billing history for each of the customers in the areas Salinas serviced for Plaintiff. Indeed, while the Franchise Agreement provides Plaintiff a right of inspection and review and restricts Salinas's use of customer lists provided by Plaintiff, the Agreement does not expressly require Salinas to turn over his business records to Plaintiff upon the

conclusion of the franchise relationship, including his business records concerning customers. The Court is not otherwise persuaded on this record that the return of the Quickbooks material, unlike the return of the Protected Information, is contemplated under the Franchise Agreement.

49. The Court concludes that Plaintiff has suffered and continues to suffer irreparable harm as a result of Salinas's breach of contract as described above.

50. The harm to Plaintiff is immediate and ongoing and cannot be later redressed by the Court if allowed to continue during the course of the litigation. Thus, the Court concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiff's rights during the course of this litigation. *See, e.g., Comput. Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *31–33 (N.C. Super. Ct. Jan. 27, 2017) (entering preliminary injunction based on alleged breach of confidentiality provision); *see also ABT, Inc. v. Juszczyk*, No. 5:09CV119-RLV, 2010 U.S. Dist. LEXIS 91613, at *9, *25 (W.D.N.C. Aug. 10, 2010) (granting preliminary injunction for claims, including a claim of breach of contract for violating a confidentiality agreement, where plaintiff's goodwill and customer relationships would be injured).

51. The Court has engaged in a balancing process, weighing potential harm to Plaintiff if an injunction is not issued against the potential harm to Salinas and the other Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiff outweighs that to Defendants.

52. Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiff is entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from retaining, using, disclosing, or distributing Plaintiff's Protected Information or from using Plaintiff's name, marks, or telephone numbers.

B.  Breach of Contract: Covenant not to Compete

53. Covenants not to compete are enforceable if they are (1) in writing; (2) made as part of the employment contract; (3) supported by valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest. *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).

54. Preliminary injunctions are especially appropriate in the context of covenants not to compete because of the immediacy of harm and the need to protect the plaintiff's rights during the pendency of the litigation. *A.E.P. Indus., Inc.*, 308 N.C. at 410, 302 S.E.2d at 764.

55. There is no evidence before the Court that any of the non-competition agreements Plaintiff purports to enforce concerning the Later Franchises were ever reduced to writing. As a result, the Court concludes that Plaintiff has failed to show a likelihood of success on its non-compete claim against Salinas as to the Later Franchises. *See, e.g.*, N.C. Gen. Stat. § 75-4 (requiring a "writing duly signed by the party who agrees not to enter into any such business within such territory").

56. The only non-competition provision reduced to writing in this case was made as part of the written Franchise Agreement and was supported by valuable

consideration in the form of a ten-year extension of the franchise relationship. As a result, Salinas will be prohibited from competing against Window Gang under the Franchise Agreement if the covenant's restrictions for time and territory are reasonable and if the covenant is designed to protect a legitimate business interest of Plaintiff.

57. When evaluating the enforceability of covenants not to compete, North Carolina courts note a distinction between those relating to the sale of business and those ancillary to employment contracts. *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 2012 NCBC LEXIS 28, at *19 (N.C. Super. Ct. May 14, 2012), *aff'd*, 228 N.C. App. 613, 747 S.E.2d 256 (2013). Our appellate courts have determined that non-competes in franchise agreements present hybrid situations where courts should combine the elements used to evaluate non-competes for the sale of a business and those used to analyze employment contracts. *Outdoor Lighting*, 228 N.C. App. at 621–22, 747 S.E.2d at 263–64.

58. As stated by our Court of Appeals:

> [t]he ultimate issue which we must decide in resolving such disputes among franchisors and franchisees is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the reasonableness of the duration of the restriction, the reasonableness of the geographic scope of the restriction, and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor.

*Id.* at 623, 747 S.E.2d at 264. Plaintiff has the burden to prove the restrictions of the covenant are reasonable. *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916.

59. "In evaluating reasonableness, the time and territory restrictions must be read in tandem." *Id.* at 311, 450 S.E.2d at 916; *see, e.g.*, *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968) ("Although a valid covenant not to compete must be reasonable as to both time and area, these two requirements are not independent and unrelated aspects of the restraint. Each must be considered in determining the reasonableness of the other."). While "either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable." *Farr Assocs. Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000). "If a non-compete covenant 'is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not enforce it.'" *VisionAir, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (quoting *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989)).

60. North Carolina courts have held that a two-year post-employment or post-sale non-competition restriction is often reasonable. *See, e.g.*, *Kinston Med. Specialists, P.A. v. Bundle*, 2015 NCBC LEXIS 48, at *7 (N.C. Super. Ct. May 7, 2015); *see also Hartman*, 117 N.C. App. at 315, 450 S.E.2d at 918 (noting that our Supreme Court has recognized that, under certain circumstances, a five-year covenant might be reasonable).

61. Our courts have also found that a fifty-mile radius in such a covenant can be reasonable in certain contexts. *See, e.g.*, *Cut N Up Hair Salon of Carolina Beach, LLC v. Bennett*, No. COA13-1417, 2014 N.C. App. LEXIS 1031, at *21 (N.C. Ct. App.

Sept. 16, 2014) (fifty-mile radius enforceable); *Keith v. Day,* 81 N.C. App. 185, 194–95, 343 S.E.2d 562, 568 (greater Raleigh area enforceable); *Robins & Weill, Inc. v. Mason,* 70 N.C. App. 537, 538–39, 320 S.E.2d 693, 695 (1984) (two-county wide covenant enforced); *Forrest Paschall Mach. Co. v. Milholen,* 27 N.C. App. 678, 687, 220 S.E.2d 190, 197 ( 1975) (350-mile non-compete upheld). However, "the scope of [a] geographic restriction must not be any wider than is necessary to protect the employer's reasonable business interests." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 84, 89, 638 S.E.2d 617, 620; *see also A.E.P. Indus., Inc.*, 308 N.C. at 408, 302 S.E.2d at 763.

62. Courts look to six factors in determining whether a post-employment restriction is valid: "(1) the area, or scope, of the restriction, (2) the area assigned to employee, (3) the area in which the employee actually worked or was subject to work, (4) the area in which the employer operated, (5) the nature of the business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation." *Outdoor Lighting*, 228 N.C. App. at 622, 747 S.E.2d at 263. An additional factor courts evaluate in the business sale context—and by extension the franchise context—is whether the restriction reasonably protects the goodwill of the plaintiff's business. *Id.* at 623, 747 S.E.2d at 264. Significantly for our purposes, "[t]o prove that a geographic restriction in a non-compete provision is reasonable, an employer must first show where its customers are located and that the geographic scope of the covenant is necessary to maintain those customer relationships." *Farr Assocs.*, 138 N.C. App. at 281, 530 S.E.2d at 882.

63. Here, the 1997 Agreement identifies Salinas's operating territory as "Wilmington NC (New Hanover County); Burnswick [sic] County North Carolina; Pender County; Duplin County[.]" (1997 Agreement Ex. G.) The subsequent Franchise Agreement lists Salinas's operating territory as the "Wilmington, NC area[.]" (Agreement Ex. A.) Plaintiff has not only offered scant evidence that Salinas and Gang Group serviced Plaintiff's customers in Wilmington, but Plaintiff has also failed to offer any evidence that Plaintiff has existing customers located within the four-county area defined under the 1997 Agreement or within the fifty-mile radius extending from Wilmington or New Hanover, Duplin, Brunswick, or Pender counties. In sum, Plaintiff has failed to offer any evidence to support its contention that the territorial restriction in the Franchise Agreement protects a legitimate business interest of Plaintiff. *Compare Beasley v. Banks*, 90 N.C. App. 458, 460–61, 368 S.E.2d 885, 886–87 (1988) (finding unreasonable a thirty-mile radius restriction where plaintiff failed to present specific evidence supporting his conclusory statement that he had customers within the thirty-mile radius and defendant offered evidence to the contrary) *with Cut N Up Hair Salon*, 2014 N.C. App. LEXIS 1031, at *20–21 (upholding fifty-mile radius where plaintiff presented evidence that customers visited business from up to fifty miles away). As such, the Court concludes that it cannot enforce the non-compete provision on the current record.

64. The Court further concludes that "blue penciling" cannot permit enforcement of the covenant at this stage of the proceedings. "[B]lue-penciling is the process by which a court of equity will take notice of the divisions the parties

themselves have made in a covenant not to compete, and enforce the restrictions in the territorial divisions deemed reasonable and refuse to enforce them in the divisions deemed unreasonable." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 699, 784 S.E.2d 457, 461 (2016) (internal quotation marks omitted). The Franchise Agreement here contains a single territorial restriction— "within a radius of 50 miles of Your Operating Territory"—and the Operating Territory is specifically defined as the "Wilmington, NC area[.]" (Agreement § 16.5, Ex. A.) Ignoring this restriction would leave the covenant without a territorial restriction at all, precluding enforcement. *See id.* at 699, 784 S.E.2d at 462.

65. The Court thus concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits on its claim for Salinas's alleged breach of his covenant not to compete and will not afford relief on this ground.

C. Breach of Contract: Non-Solicitation Agreement

66. Non-solicitation agreements "must meet the same requirements as are applied to . . . covenant[s] not to compete[,]" including that they be "reasonable as to time and territory." *Aeroflow Inc. v. Arias*, 2011 NCBC LEXIS 21, at *24 (N.C. Super. Ct. July 5, 2011). Non-solicitation agreements, however, can more easily be enforced than covenants not to compete, "as [their] restraints . . . are generally more tailored and less onerous on employees' ability to earn a living." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *31 (N.C. Super. Ct. Nov. 3, 2011).

67. In addition, "North Carolina's courts will enforce a covenant prohibiting a former employee from soliciting his former employer's customers even when not tied to a specific geographic region where 'the terms and conditions of this contract clause

were reasonably necessary to protect the employer's legitimate business interests.'" *Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at \*25–26 (N.C. Super. Ct. Aug. 1, 2016) (quoting *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 229, 393 S.E.2d 854, 857 (1990)). "A customer-based restriction on solicitation is analyzed in much the same manner as a geographic restriction, taking into consideration many of the same factors and, particularly, the time period of the restriction." *Id.* (citing *Wade S. Dunbar Ins. Agency v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335 (2001)).

68. The non-solicitation provision in the Franchise Agreement provides that Salinas is "not permitted to solicit customers and/or advertise outside the defined Operating Territory, except to the extent that [Salinas has] received [Window Gang's] prior written authorization." (Agreement § 7(q).) The provision does not contain a geographic restriction or a time period. Neither does the provision define "customers" or attempt to restrict Salinas from soliciting only customers or potential customers with whom he has had meaningful contact. To the contrary, the restriction seeks to preclude Salinas from soliciting the very customers he was precluded from calling upon during his franchise relationship with Plaintiff. As such, the Court cannot conclude on this Motion that the non-solicitation provision is enforceable. *See, e.g.*, *Hejl v. Hood, Hargett & Assocs., Inc.*, 196 N.C. App. 299, 307, 674 S.E.2d 425, 430 (2009) (restrictive covenant for solicitation unenforceable where the "[a]greement reaches not only [customers], but potential [customers], and extends to areas where Plaintiff had no connections or personal knowledge of customers"); *Farr Assocs.*, 138

N.C. App. at 282, 530 S.E.2d at 883 ("[A] client-based limitation cannot extend beyond contacts made during the period of the employee's employment."); *Okuma Am. Corp.*, 181 N.C. App. at 90, 638 S.E.2d at 621 (requiring scope of non-solicitation covenant to be no wider than necessary to protect the employer's reasonable business interests).

69. Exhibit C to the Franchise Agreement cannot provide an alternative basis for enforcement as Plaintiff suggests. First, like the Franchise Agreement, Exhibit C does not include a territorial restriction for the purported non-solicitation agreement contained therein. Moreover, by its plain language, Exhibit C does not preclude Salinas or the other Defendants from soliciting customers but rather restricts only Salinas's employees. Plaintiff contended at the hearing that relief should be based on Salinas's breach of section 12.2 of the Franchise Agreement, which requires him to cause his managerial and supervisory employees to execute Exhibit C and to use his "best efforts" to ensure their compliance with that document. Plaintiff, however, has not offered evidence that Salinas has breached section 12.2 or that injunctive relief is proper for such a breach. As a result, the Court concludes that Plaintiff has failed to show a likelihood of success on its claim for breach of the non-solicitation provision and thus will not afford Plaintiff relief on that basis.

D. Unfair and Deceptive Trade Practices

70. To establish a violation of N.C. Gen. Stat. § 75-1.1, a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in

question was in or affecting commerce, and (3) the act proximately caused injury to plaintiff." *E.g.*, *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

71. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, [unscrupulous], or substantially injurious to consumers." *Johnson v. Phoenix Mut. Ins. Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980). An act or practice is deceptive under the meaning of §75-1.1 if it has the capacity or tendency to deceive. *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 748, 600 S.E.2d 492, 501 (2004).

72. Injunctive relief is available to plaintiffs who bring private suits under N.C. Gen. Stat. § 75-1.1. *See, e.g.*, *Johnson v. Honeycutt*, No. COA05-295, 2006 N.C. App. LEXIS 249, at *4 (N.C. Ct. App. Feb. 7, 2006) (affirming trial court judgment where trial court issued a preliminary injunction based on unfair and deceptive trade practices claim); *Union Carbide Corp. v. Sunox, Inc.*, 590 F. Supp. 224, 227–28 (W.D.N.C. 1984) (applying preliminary injunction standard to claim brought under N.C. Gen. Stat. § 75-1.1). *See generally* Noel L. Allen, *North Carolina Unfair Business Practice* § 12.01 (3d ed. 2015).

73. Based on the Court's findings of fact, the Court concludes that Plaintiff has shown a likelihood of success on the merits of its section 75-1.1 claim by presenting persuasive evidence of Defendants' misleading statements and representations concerning Window Ninjas's status as the same as, a successor to, or a continuation of Plaintiff that deceived Plaintiff's customers and advantaged Defendants in their trade and business at Plaintiff's expense with intended and resulting harm to

Plaintiff.  *See, e.g., Comput. Design & Integration*, 2017 NCBC LEXIS 8, at \*33–36; *Air Cleaning Equip. v. Clemens*, No. 16 CVS 900, 2016 N.C. Super. LEXIS 121, at \*25–26 (N.C. Super. Ct. Apr. 29, 2016).

74.    The Court further concludes that such conduct has resulted in irreparable harm to Plaintiff, and if not enjoined, will continue to result in irreparable harm to Plaintiff because there is no adequate remedy at law, there is substantial difficulty and uncertainty in determining the amount of damages to be awarded for Defendants' conduct, and the injury Defendants have inflicted, and unless enjoined will continue to inflict, on Plaintiff is one to which Plaintiff should not be required to submit or Defendants permitted to inflict based on the record before the Court.

75.    The Court has engaged in a balancing process, weighing the potential harm to Plaintiff if an injunction is not issued against the potential harm to Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiff outweighs that to Defendants.

76.    The Court further concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiff's rights during the course of this litigation.  Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiff is entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from making any misrepresentations to any person or entity, including Window Gang's existing or potential customers, concerning Window Ninjas's status as the same as, a successor to, or a continuation of Window Gang.

IV.

CONCLUSION

77. **WHEREFORE**, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it is hereby **ORDERED**, in the exercise of the Court's discretion, that pending final resolution of this civil action, and unless and until otherwise ordered by this Court:

    a. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and **ENJOINED**, during the pendency of this action, from using, disclosing, or distributing Plaintiff's Protected Information (as defined herein);

    b. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and **ENJOINED**, during the pendency of this action, from making any misrepresentation to any person or entity, including to Plaintiff's existing or potential customers, asserting that Window Ninjas is a successor entity to, a continuation of, the same entity as, or in any way connected to Plaintiff. This prohibition shall include representations that Window Ninjas is "formerly Window Gang" and words to that effect;

    c. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and

**ENJOINED**, during the pendency of this action, from making or distributing any advertisement asserting that Window Ninjas is a successor entity to, a continuation of, the same entity as, or in any way connected to Plaintiff. This prohibition shall include making or distributing any advertisement or communication, including invoices, that uses the Window Gang name or logo;

d. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **ORDERED** to remove any and all references to Window Gang on their Facebook pages, websites, and Google pages;

e. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and **ENJOINED**, during the pendency of this action, from advertising, directing callers to use, or otherwise using the following phone numbers:

> Wilmington/Jacksonville, NC
> 910-794-2770
> 910-455-5998
> 910-763-9330
>
> Charleston, SC
> 843-744-3447
> 843-849-9003
>
> Columbia, SC
> 803-212-0018
>
> Greenville/Spartanburg, SC
> 864-297-6890

864-814-4264

Myrtle Beach, SC
843-213-1760

Nashville, TN
615-600-2981
615-371-0089

Richmond, VA
804-359-4800

Virginia Beach, VA
757-425-1211
757-425-4454

Hampton, VA
757-928-0420
757-928-0200

f. Defendants are hereby **ORDERED** to port the telephone numbers in the preceding subparagraph so that they may be returned to Plaintiff;

g. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and **ENJOINED**, during the pendency of this action, from using Plaintiff's names and marks and from using, or accessing the contents of, the windowgangwilmington@gmail.com email account;

h. Defendants are hereby **ORDERED** to return to Plaintiff all of Plaintiff's Protected Information. Defendants are further ordered to file a statement with the Court within sixty (60) days of the entry of this Order certifying that Defendants have fully complied with this

subparagraph or attesting they do not have any of the Protected Information.

i. Pursuant to N.C. Gen. Stat. § 1A-1, Rule 65(c), this Order shall become effective upon Plaintiff's posting of security in the amount of Ten Thousand Dollars ($10,000.00) ("Security"), which the Court concludes, in the exercise of its discretion, is reasonable and appropriate as a condition of granting this preliminary injunction. The Security shall be in the form of cash, check, surety bond, or other undertaking satisfactory to the Clerk of Superior Court of Carteret County. The Court's order concerning Plaintiff's posting of security is without prejudice to any party's right to move the Court to adjust the amount of the Security for good cause shown.

**SO ORDERED**, this the 21st day of February, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
for Complex Business Cases